**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
|     **FATEMEH NAJAFIAN** | ) | **Case No. 09-18112-BFK** |
| | ) | **Chapter 7** |
|                 **Debtor** | ) | |
| | ) | |
| **FATEMEH NAJAFIAN** | ) | |
| | ) | **Adversary Proceeding No. 11-01650** |
|                 **Plaintiff** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **EDUCATIONAL CREDIT MANAGEMENT** | ) | |
| **CORPORATION** | ) | **NOT FOR PUBLICATION IN WEST'S** |
| | ) | **BANKRUPTCY REPORTER** |
|                 **Defendant** | ) | |

**MEMORANDUM OPINION**

This matter came before the Court for a trial on the merits on September 11 and 12, 2012. The Plaintiff asserts that her student loans should be discharged under the hardship discharge standard of 11 U.S.C. § 523(a)(8). The Defendant, Educational Credit Management Corporation (ECMC), the assignee of certain of the Plaintiff's student loan obligations from Sallie Mae, objects. The Court finds that, given the heavy burden for the discharge of student loans in this Circuit, the Plaintiff has not met her burden of proof. The Court will enter an Order denying the request for a hardship discharge.

**Findings of Fact**

Having heard the evidence, the Court makes the following findings of fact:

**A. Dr. Najafian's Education and Employment Experience.**

1.      Dr. Fatimah Najafian is 65 years old.  She is an Ophthalmologist.  She is presently unemployed and homeless, living in her car.  How she has come to this state of affairs still isn't clear to the Court, despite having heard her extensive testimony.  The Court will endeavor to reconstruct the events to the best extent possible.

2.      Dr. Najafian was born in Iran.  She came to the United States in September 1973.  She earned a Bachelor's Degree in English Literature and Language, and Persian Literature and Language, while living in Iran.

3.      She obtained a Master's Degree in Special Education in 1975, from George Washington University, with a specialty in diagnostic prescriptive teaching.

4.      She attended a doctoral program in education at George Washington University from 1975 to 1978.  She testified that she finished all of the course work, had completed the exams, written and oral, and was working on her thesis, but did not earn her doctorate.

5.      Dr. Najafian worked for some time as an educational consultant.  She worked in this field as a bi-lingual education counselor, mostly working with Iranian students on student visa issues.

6.      Dr. Najafian eventually decided that she wanted to be a physician.  She completed pre-med courses at Howard University, in Washington, D.C.  She was accepted at Howard University Medical School, which she attended for two semesters.  She then transferred to Georgetown University School of Medicine.

7.      Dr. Najafian received her M.D. degree from Georgetown in May 1990.  She then underwent an internship in internal medicine at George Washington University Medical Center, for roughly a year.

8. She completed her residency in Ophthalmology at George Washington University Medical Center from 1992 to 1995.

9. Following her residency, Dr. Najafian went to St. Louis, Missouri, for a fellowship in Ophthalmology. She then completed two further fellowships in Ophthalmology, again at George Washington University.

10. Dr. Najafian has a license to practice medicine in Washington, D.C., Maryland, Virginia and Missouri (this last State license is now inactive).

11. Over the years, Dr. Najafian has held various positions in her field. She was a Technician with George Washington University. She also was an Attending Physician at George Washington University.

12. In 2001, Dr. Najafian took a position with Capital Eye Physicians and Surgeons, in Washington, D.C. Her base salary ranged from $90,000 in her first year, to $160,000 in her highest earning year. In addition, she was entitled to bonus compensation based on the number of patients she saw and the income that she generated. However, any income that she actually received in excess of her base salary was *de minimis*.

13. Dr. Najafian remained employed with Capital Eye Physicians until March 2006, when she was terminated. She has not been employed since.

**B. Dr. Najafian's Student Loans.**

14. In order to finance her medical education, Dr. Najafian took out two student loans from Sallie Mae and the Department of Education. One of the loans was for the original principal amount of $72,021. The other was for the original principal amount of $44,500. The Department of Education later assigned its loan to ECMC.

15. Dr. Najafian made efforts to repay the student loans while she was employed. She testified, and the Court accepts her testimony, that she lived a frugal lifestyle, with no unnecessary expenditures or vacations, for years, in order to repay her student loans.

16. However, when her employment was terminated with Capital Eye Physicians, she was forced to stop making payments on her student loans. Her last payment on either of her student loans was in March 2006.

### C. Dr. Najafian's Termination from Capital Eye Physicians and the Subsequent Arbitration.

17. Dr. Najafian maintains that she was terminated for improper reasons at Capital Eye Physicians. Specifically, she claims that another physician there used her Medicaid provider identification number in order to collect fees to which she was entitled as the provider.

18. Dr. Najafian and Capital Eye Physicians entered into binding arbitration. At the conclusion of the arbitration, Dr. Najafian was awarded a sum of money, which, after payment of her lawyers and the expenses of the arbitration, amounted to $93,000.

19. Dr. Najafian did not use any of this money to repay her student loans. She testified that she tried to negotiate a settlement of her student loans, but that Sallie Mae refused.

### D. Dr. Najafian's Current Financial Circumstances and Her Prospects for Future Employment.

20. No one can dispute that Dr. Najafian's current financial circumstances are dire. She is unemployed, and has had no income since she was terminated from Capital Eye Physicians, in March 2006. She has lost her home, a condominium in McLean, Virginia, to a foreclosure. She has filed for Chapter 7 bankruptcy. She has no other source of income. Most disturbingly, she is living in her car, sleeping in parking lots and attending to her personal needs in public restrooms. She has little in the way of possessions, some of which are in storage,

others of which are in her car. At this point, she appears unable to meet even the most basic necessities of living. It is a sad and tragic ending to a promising career in Ophthalmology, a profession that she indisputably loved, and to which she dedicated her adult life, to the exclusion of other pursuits such as marriage or children.[1]

21. Dr. Najafian testified, the Court accepts, that she has made extensive efforts to obtain employment as a physician in her field, that of Ophthalmology. She applied for numerous positions all over the country as a physician in Ophthalmology. Her efforts at securing employment in this field were unceasing.

22. At the same time, the Court finds that she has made a conscious decision not to seek employment in any field other than that of Ophthalmology, nor for any position less than that of a physician within that field. She openly admitted at the trial that she does not want a position in any other endeavor, asserting that she has given her adult life to the field of Ophthalmology and that to her, any employment outside of that field would be, in her words, a death sentence.

23. Dr. Najafian will be eligible for Social Security Income next year, when she attains the age of 66. She will be eligible for approximately $1,300 per month in benefits.

**E. Dr. Najafian's Attempts to Explore Alternative Means of Repayment.**

24. Prior to the trial, counsel for ECMC sent Dr. Najafian a letter, explaining to her the Income Based Repayment (IBR) Program, commonly known as the Ford Program, and encouraging her to apply. She has not applied. The Court finds that she has rejected the

---

[1] At the conclusion of the trial, the Court urged Dr. Najafian to seek assistance from State and local housing agencies. Specifically, the Court noted that Fairfax County, where Dr. Najafian's place of residence was located before her eviction, has programs designed to help people in her circumstances. The Court hopes that Dr. Najafian takes this advice to heart, regardless of the outcome of this case.

program out of hand, and has made little effort to actually understand its terms. Dr. Najafian did not understand the difference between references and guarantors, believing (mistakenly) that ECMC or the government could "come after" her references, if she submitted their names in support of her application.

25. Dr. Najafian also was of the understanding that her Social Security Income (for which she will be eligible next year) will be counted for purposes of eligibility for the Ford Program.

26. Dr. Najafian also testified that she did not want to participate in the Ford Program because she believed that there will be adverse tax consequences. Specifically, if and when the debt is forgiven 25 years from now, she testified that she will have cancellation of indebtedness income, for which she will have a tax liability to the IRS.

**F. Dr. Najafian's Demeanor.**

27. Dr. Najafian was the only witness to testify at the trial. The Court had the opportunity to observe her demeanor, both in her testimony and in her opening and closing statements to the Court.

28. Dr. Najafian represented herself, *pro se.* She is obviously very highly educated, and is an intelligent individual. She is passionate about her circumstances. She is equally passionate about being a physician, and is eager to return to the status of life as a respected member of the medical profession.

29. At the same time, she is inflexible in her desire to return only to the medical profession, in her chosen field of Ophthalmology.

30. Although Dr. Najafian presented no evidence of her mental health from any psychiatrist, psychologist or therapist, the Court could not help but detect a strain of paranoia.

Everything that has brought her to this sad state of affairs is someone else's fault. Beginning at George Washington in the 1990's, Dr. Najafian testified that she was subjected to overt religious discrimination, that people there were rude to her, and that she was advised that she was the "target" of the other physicians there. She testified that when she graduated from medical school, she was told by a physician with the Pennsylvania Board of Medicine that, in order to be licensed there she needed to go back to medical school, despite just having graduated from Georgetown Medical School, and having completed her residency in Ophthalmology. She testified that when she returned to D.C. from Missouri, one doctor told her that she should return to Iran. She testified further that at least one physician at Capital Eye Physicians was using her Medicaid provider i.d., and that her income suffered as a result. Any or all of these incidents may be true; the Court cannot make a finding one way or the other. But the Court notes that Dr. Najafian views herself as a victim of all of these circumstances, and at the end of the day, accepts no responsibility for her current state of affairs.

31. Finally, Dr. Najafian testified that she is experiencing physical difficulties. An excessive amount of fluid has built up in her legs as a result of sitting in her car for long stretches at a time. She also testified that for the first time in her life, she was diagnosed with diabetes.

### Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and the Order of Reference of the U.S. District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) (determination as to the dischargeability of particular debts).

The issue before the Court is whether the Plaintiff can discharge her student loans under section 523(a)(8) of the Bankruptcy Code. The Plaintiff bears the burden of proof on all issues

7

under section 523 of the Bankruptcy Code. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The standard of proof is a preponderance of the evidence. *Id*. More specifically, the Plaintiff has the burden of proof on each of the three prongs of the *Brunner* test, discussed below. *In re Frushour,* 433 F.3d 393, 400 (4th Cir. 2005) ("The debtor has the burden of proving all three factors by a preponderance of the evidence.").

Section 523(a)(8) of the Code provides that a discharge under Sections 727, 1141, 1228(a), 1228(b), or 1328(b) does not discharge an individual debtor from any debt:

> unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>
> (A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>     (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

11 U.S.C. § 523(a)(8). This is known as the "hardship discharge" for student loans. There is no dispute that in this case, Dr. Najafian's obligations to ECMC are student loans within the meaning of Section 523(a)(8).

In *In re Frushour*, the Fourth Circuit discussed the hardship discharge in the context of the importance of the availability of funding for student loans, noting:

> In enacting the undue hardship standard, Congress had to take into account the viability of the student-loan program. That program serves valuable purposes. It affords individuals in all walks of life the opportunity to obtain an education, and with it the mobility and financial stability that an education can provide. Indeed, without the program, many people would never receive any higher education, because their credit risks would preclude them from obtaining private commercial loans. *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 46 B.R. 752, 756 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395

8

(2d Cir.1987). The program does not just give loan recipients such as Frushour the major benefits of a taxpayer-funded education. As history has shown, a well-educated society is critical to our general welfare and prosperity.

433 F.3d at 399.

The Fourth Circuit has adopted the *Brunner* test for the hardship discharge of student loans.  *In re Frushour*, 433 F.3d at 400 (citing *Brunner v. N.Y. State Higher Educ. Loan Auth.*, 831 F.2d 395 (2nd Cir. 1987)).  Under *Brunner,* the test for the discharge of a student loan is a three part test:

>  (1)  that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents, if forced to repay the loans;
>  (2)  that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>  (3)  that the debtor has made good faith efforts to repay the loans.

*Brunner,* 831 F.2d at 396.

The Court will address each of the three prongs under the *Brunner* test.

>  *1. Whether the Debtor Cannot Maintain, Based on Current Income and Expenses, a "Minimal" Standard of Living for Herself and Her Dependents, if Forced to Repay the Loans.*

ECMC conceded at trial that this prong of the *Brunner* test has been met.  The evidence was uncontradicted that the Debtor is not currently maintaining a minimal standard of living. The Court finds that the Debtor would be unable to maintain a minimal standard of living, if she were forced to repay the loans.

>  *2. Whether Additional Circumstances Exist Indicating that this State of Affairs is Likely to Persist for a Significant Portion of the Repayment Period of the Loans.*

This second prong of the *Brunner* test is a closer question in this case.  This factor has been described by the Fourth Circuit as the "heart of the *Brunner* test." *In re Frushour*, 433 F.3d at 401.  It has been described as a "demanding requirement." *Id*. (citing *Brightful v. Pa. Higher*

*Educ. Assistance Agency (In re Brightful),* 267 F.3d 324, 328 (3rd Cir. 2001)). It necessitates a finding that a "certainty of hopelessness" exists. *Id.* The Fourth Circuit noted in *Frushour* that "only a debtor with rare circumstances will satisfy this factor," citing such examples as "illness, disability, a lack of useable job skills, or the existence of a large number of dependents." *Id.* (quoting *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler),* 397 F.3d 382, 386 (6th Cir. 2005)).

Clearly, neither Dr. Najafian's age alone, nor her present physical difficulties, will suffice to meet this demanding standard. In *In re Spence*, the Fourth Circuit held that a debtor in her late 60's, with diabetes and high blood pressure, was not entitled to a discharge of her student loans. 541 F.3d 538 (4th Cir. 2008). At the same time, it has to be recognized that the second prong of the *Brunner* test originally was stated as follows:

> Predicting the future, however, is never so easy. Minimum necessary future expenses may be ascertained with some precision from an extrapolation of present needs, but unpredictable changes in circumstances such as illness, marriage, or childbirth may quickly wreak havoc with such a budget. Even more problematic is the calculation of future income. It is the nature of § 523(a)(8)(B) applications that they are made by individuals who have only recently ended their education. Their earning potential is substantially untested, and because they are inexperienced they are in all likelihood at the nadir of their earning power. They may, like appellee, have had difficulty in securing employment immediately after graduation. Extrapolation of their current earnings is likely to underestimate substantially their earning power over the whole term of loan repayment.

*In re Brunner*, 46 B.R. 752, 754-55 (S.D. N.Y. 1985). In this case, Dr. Najafian is not at the beginning of her earning potential; she is nearing the end of her working life, and she will be eligible for social security next year. In the six years since she was terminated from Capital Eye Physicians, she has been unable to secure any employment as a physician in Ophthalmology, despite her best efforts to do so.

By her own testimony, though, Dr. Najafian has failed to seek employment in any field other than Ophthalmology, nor in any position other than as a physician within Ophthalmology. Dr. Najafian certainly cannot be blamed for seeking employment as a physician in the field to which she has devoted much of her adult life. She is, however, emphatic in her desire not to seek employment elsewhere. She adamantly refuses to consider any other position – e.g., as a lab technician, physician's assistant or some position of lower prestige and pay – even within the field of Ophthalmology.

Dr. Najafian does not claim an inability to find gainful employment due to medical or mental health problems. She presented no evidence from any mental health professional, and she does not appear to have sought any counseling or other mental health services since she stopped paying on her student loans in March 2006.[2] Rather, she claims that she has been "blacklisted" within the field of Ophthalmology. She presented no evidence in support of this claim, other than her own conclusory allegations. Dr. Najafian was the only witness to testify at the trial. No other ophthalmologist or member of the medical profession supported this claim.

The Court concludes, based solely on the evidence presented, that Dr. Najafian has not met her burden of proof here.

> 3. *Dr. Najafian's Good Faith in Attempting to Repay the Student Loans or in Considering Alternatives.*

The Fourth Circuit has held that the Debtor's effort to seek out loan consolidation options that make the debt less onerous is an important component of the good faith inquiry. *In re*

---

[2] Judge St. John of this Court has written an insightful opinion on the inability of debtors in student loan hardship cases to engage mental health professionals to testify as expert witnesses. *In re Burton*, 339 B.R. 856, 874 (Bankr. E.D. Va. 2006) ("it is challenging for debtors to enlist the help of medical professionals, particularly experts, in the prosecution of their case" quoting *Mosley v. Gen. Revenue Corp. (In re Mosley),* 330 B.R. 832, 843 (Bankr. N.D. Ga. 2005)).

*Mosko*, 515 F.3d 319, 326 (4th Cir. 2008); *In re Frushour*, 433 F.3d at 402.  In both *Mosko* and *Frushour*, the Fourth Circuit endorsed the Ford Direct Loan Consolidation Program.

Although the regulations can be complex, there are two basic loan repayment options that may be available to Dr. Najafian.  The Income Contingent Repayment Plan is found at 34 C.F.R. § 685.209.  Under this program, the amount payable by the borrower is the lesser of:

(i) The amount the borrower would repay annually over 12 years using standard amortization multiplied by an income percentage factor that corresponds to the borrower's adjusted gross income (AGI) as shown in the income percentage factor table in a notice published annually by the Secretary in the Federal Register; or

(ii) 20 percent of discretionary income.

34 C.F.R. § 685.209(a)(2).

Under the Income Contingent Repayment Plan (ICRP), the maximum repayment period is 25 years.  34 C.F.R. § 685.209(c)(4)(i).  Interest that is not repaid during this period is capitalized (i.e., added to the loan balance), but once the outstanding principal loan balance is ten percent greater than the original loan amount, interest continues to accrue, but is not capitalized. 34 C.F.R. § 685.209(c)(5).  The borrower is eligible for loan forgiveness after 25 years of complying with the plan.  34 C.F.R. § 682.215(f).

The second option, the Income Based Repayment Plan (IBR), is found at 34 C.F.R. § 685.221.  Under this program, the borrower's monthly loan payments are "limited to no more than 15 percent of the amount by which the borrower's AGI [Adjusted Gross Income] exceeds 150 percent of the poverty guideline applicable to the borrower's family size, divided by 12."  34 C.F.R. § 685.221(b)(1).  The borrower is eligible for loan forgiveness after 25 years.  34 C.F.R. §

685.221(f).  Information on the IBR can be found on the Department of Education's web site at

http://studentaid.ed.gov/repay-loans/understand/ plans/income-based (last visited Oct. 3, 2012).[3]

       ECMC's letter to Dr. Najafian described the foregoing options and suggested that she consider applying either for the ICRP or IBR option.  ECMC Exh. I.  Under either option, according to ECMC, Dr. Najafian would have an estimated payment of *$0.00 for 300 months,* at which point the loan would be forgiven.  *Id*.  When Dr. Najafian becomes eligible for Social Security next year, she will receive $1300 per month from Social Security.  The Adjusted Gross Income for this is $0.00.  *See Form 1040*, IRS.gov (last visited Oct. 3, 2012), www.irs.gov/pub/irs-pdf/f1040.pdf; *Form 1040 Instructions*, IRS.gov (last visited Oct. 3, 2012), http://www.irs.gov/pub/irs-pdf/i1040.pdf.  Therefore, Dr. Najafian's future social security income, by itself, is not enough to trigger repayment under the IBR or ICRP options.

       Dr. Najafian refused to consider these programs for two reasons.  First, she irrationally believed that the government (or more accurately, ECMC) could "come after" persons that she might use as references, confusing the term "reference" with "guarantor."  The program simply requests that the Debtor list references, not have guarantors sign and guarantee her loan.

       Second, when Dr. Najafian researched these programs, she found that when the loan is forgiven, she could potentially owe taxes to the IRS based on the forgiveness of debt income.  She is correct in the limited sense that a bankruptcy discharge of the indebtedness would not be taxable (IRC § 108(a)(1)(A)), while the forgiveness of debt could be.  But, she is not correct for two more important reasons.  First, it isn't entirely clear that there will be a tax liability at all.

---

[3]  A third option would be to apply for a discharge of the loans due to a total and permanent disability. 34 C.F.R. § 685.213(a)(1).  In order to claim a total and permanent disability, the borrower must demonstrate that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted for a continuous period of 60 months, or can be expected to last for not less than 60 months.  34 C.F.R. § 682.200.  In this case, Dr. Najafian does not claim a total and permanent disability.

There is an exception for forgiveness of debt income where the taxpayer is insolvent at the time of the forgiveness of the debt.  IRC § 108(a)(1)(B).  If Dr. Najafian's circumstances are unchanged for the next 25 years (as she strongly urges, with respect to the second *Brunner* prong), she undoubtedly will be insolvent at the time of the debt forgiveness and no tax will arise at all.  *Educational Credit Mgmt Corp. v. Rhodes*, 464 B.R. 918, 926 (W.D. Wash 2012) ("cancellation of debt after 25 years of participation in income-based plans only results in tax liability if the borrower's assets exceed his liabilities immediately prior to the cancellation of the debt");  *In re Arroyo,* 470 B.R. 18, 29 (Bankr. D. Mass. 2012) ("Tax liability is therefore not certain to flow from discharge of liability under an ICRP.  Rather, a participant in an ICRP will realize taxable income only to the extent that, immediately before the discharge, her assets exceed her liabilities.").

Second, and more fundamentally, it is a mystery why a potential tax debt 25 years from now would motivate Dr. Najafian not to participate in the IBR program.  In *Brunner* terms, the Court is unable to find good faith on the part of the Debtor where she refuses to consider the IBR program based on a potential (and only a potential) tax liability that might arise when she is well into her eighties.  *See also In re Archibald,* 280 B.R. 222, 229 (Bankr. S.D. Ind. 2002) ("Several courts have addressed this, finding that any possible income tax liability in the future is too speculative to rule out the feasibility of the ICRP.").

Dr. Najafian's obstinate refusal to consider any alternative repayment program is just baffling to the Court.  The Court finds that Dr. Najafian has not met the third, or good faith, prong of the Brunner test.

**Conclusion**

For the foregoing reasons, the Debtor has not met her burden of proof under 11 U.S.C. § 523(a)(8). A separate Order will issue, holding the ECMC obligations to be non-dischargeable.

Date: _____        _____
                                             Brian F. Kenney
Alexandria, Virginia                         United States Bankruptcy Judge


Copies to:

Dr. Fatemeh Najafian
P. O. Box 417
Mc Lean, VA 22066
Plaintiff *pro se*

Educational Credit Management Corporation
c/o Rand L Gelber, Esquire
One Church Street
Suite 802
Rockville, MD 20850
Defendant

Robert L. Deichmeister, Esquire
Hartsoe & Morgan PLLC
4084 University Drive, Suite 100A
Fairfax, VA 22030
Counsel for Sallie Mae